UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. CHRYSANTHE PARKER, | § | No. 5:21-CV-175-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| SPOTIFY USA, INC., HIGH FIVE | § | |
| CONTENT, LLC, TRADECRAFT | § | |
| ALTERNATIVE, LLC, JASON | § | |
| CAVANAGH, | § | |
| | § | |
| Defendants. | § | |
| | § | |

ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS

Before the Court is Spotify USA, Inc., High Five Content, LLC,

Tradecraft Alternative, LLC, and Jason Cavanagh's ("Defendants") Motion to

Dismiss filed on April 26, 2021.  (Dkt. # 12.)  Dr. Chrysanthe Parker ("Plaintiff")

filed a response on May 28, 2021 (Dkt. # 16), and Defendants replied on June 25,

2021 (Dkt. # 21).  The Court held a hearing on this matter on October 29, 2021.

(Dkt. # 23.)  After careful consideration of the memoranda filed in support of and

against the Motion, the Court **GRANTS** Defendants' Motion to Dismiss for the

reasons that follow.

<u>BACKGROUND</u>

This case concerns the alleged defamation of Plaintiff in Defendants' podcast "Son of a Hitman" about the late Charles Harrelson and the assassination of U.S. District Court Judge John H. Wood, Jr.  (Dkt. # 1 at 1.)

Plaintiff, a law school graduate, alleges that she was outside of her apartment in Alamo Heights on the morning of May 29, 1979, when she bumped into Charles Harrelson.  (<u>Id.</u> at 3.)  Charles Harrelson had been hired by a drug lord named Jamiel "Jimmy" Chagra to assassinate Judge Wood.  (<u>Id.</u>)  Plaintiff provided testimony against Harrelson during his trial for Judge Wood's assassination as an eyewitness, placing Harrelson at Judge Wood's apartment building on the morning of the assassination.  (<u>Id.</u>)  Plaintiff states that "her testimony was by no means the only or even key evidence of his guilt."  (<u>Id.</u>)  After his conviction at trial, Harrelson was sentenced to two consecutive life terms plus five years, and he eventually died in prison in 2007.  (<u>Id.</u>)

Plaintiff alleges that Harrelson's sons, Brett, Jordan, and Woody, have attempted to cast doubt on their father's guilt since his conviction, including by paying for his appellate "dream team" consisting of Alan Dershowitz.  (<u>Id.</u>)  Plaintiff claims that Woody Harrelson has stopped his zealous advocacy of his father's innocence in more recent years, but Brett and Jordan have "picked up the torch."  (<u>Id.</u> at 4.)  Plaintiff alleges that Brett and Jordan Harrelson teamed up with

Jason Cavanagh to create a ten-episode podcast series called "Son of a Hitman," which was produced by High Five Content, distributed by Spotify, and executive produced by Brett Harrelson.  (Id.)  Plaintiff describes the podcast as taking itself seriously and attempting to style itself as a true crime podcast "reexamining loose threads of a crime for which the wrong man may have been convicted."  (Id.)

However, Plaintiff goes on to state that the podcast only loosely tells Charles Harrelson's story of his life and crimes, "while teasing the audience with the never-substantiated possibility that there's more to his story than history knows."  (Id.)  Plaintiff claims that the podcast is largely an attempt to muddy the waters of history and accuses the podcast host of "purposely avoid[ing] actually interviewing many of his sources, preferring to send a private investigator to do the leg work and using semiscripted conversations between the PI and himself to try to build tension."  (Id.)  Plaintiff also maintains that the host speculates without evidence that witnesses were lying or had unknown motives or that unknown parties were actually involved with the murder of Judge Wood.  (Id.)  Plaintiff alleges that the host implies to the audience that his life may be in danger but fails to inform the audience of how or why his life would be in danger.  (Id. at 5.)  She then states that the host also "almost never" attempted to confirm his interviewees' stories and often just let conversations and interviews play on the podcast without any verification.  (Id.)

Plaintiff alleges that the podcast leaves the audience with the impression that "the truth is ultimately unknowable, not that this was a thoroughly litigated criminal proceeding, upheld twice by the Fifth Court of Appeals, and twice examined by the Supreme Court of the United States." (Id.)  She also alleges that Harrelson's sons' goal was "to expose the magnitude of how corrupt this trial was and how [his] . . . father, Charles Harrelson, didn't receive a fair trial." (Id.)  Plaintiff says that the involvement of Brett and Jordan Harrelson can explain the tone and biased perspective of the podcast, and further, that she would not have agreed to be interviewed if she had known of their involvement. (Id.)  To this end, she claims that the host purposely concealed their involvement when he called her to a request an interview. (Id.)  Plaintiff states that she was familiar with the "Harrelson brothers' crusade to cast doubt on their father's conviction," but that she was unaware of the Harrelson brothers' involvement with the host or podcast in general as indicated by Brett Harrelson serving as an executive producer for the project. (Id.)  Plaintiff says that if she had known of the Harrelson brothers' involvement, she would have "predicted that any interview she gave would be twisted to give the impression Charles Harrelson had been railroaded by the federal government and that her eyewitness testimony was unreliable." (Id. at 5–6.)

In addition, Plaintiff alleges that the host labeled her "a very unusual witness," even using that phrase in naming the sixth episode of the series in which

4

her interview was featured.  (Id. at 6.)  In that episode, the host apparently represented her as the star witness and gave particular emphasis to the fact that the FBI had used hypnosis when it conducted some of her interviews.  (Id.)  The host called it a "display of questionable judgment."  (Id.)  She further states that the podcast only used five minutes of her ninety-minute interview with the host, which were selected allegedly "to lead the audience to the conclusion that Charles Harrelson's conviction relied on information obtained through her hypnosis, and that Dr. Parker was complicit in a scheme to convict Charles Harrelson with fabricated evidence that should have been inadmissible."  (Id.)

Plaintiff maintains that this was all false and that the podcast misrepresented the FBI's reliance on hypnosis by not disclosing that her hypnosis testimony was not relied on by the prosecution in making its case and that at the time it was discussed in the podcast, the host had been discussing testimony elicited from her by Harrelson's defense counsel.  (Id.)  Plaintiff also asserts that the podcast implies she was only found by the FBI after a desperate search for evidence by saying that she was "'found' after an extensive search for any witnesses," which is untrue according to her because she contacted the FBI as soon as she learned of the murder of Judge Wood.  (Id.)  She also claims that the host knew that and still chose to lead the "audience to the false conclusion that Dr. Parker, as a young attorney and officer of the Court, was either complicit or

5

actively participated in manufacturing evidence to perpetuate an unfair trial on

Charles Harrelson." (Id.)  To support this claim, Plaintiff states that Cavanagh

spoke with former FBI agents familiar with the Harrelson investigation and that he

knew Plaintiff was not a "found" witness or a "star" witness and that it was not true

that Plaintiff's testimony was obtained using hypnosis. (Id. at 7.)  Plaintiff also

asserts that the trial transcript supports the falseness of these representations from

the podcast. (Id.)

      As well as working as an attorney, Plaintiff is also "a multiply

certified healthcare professional with over twenty years of experience as a treating

practitioner, clinical researcher, and academic medical educator in the field of post-

Traumatic stress disorder." (Id.)  Using her medical training, she testifies as an

expert witness to help judges and jurors understand trauma and its various effects.

(Id.)  Plaintiff asserts that a reputation for honesty and professionalism is necessary

to be effective in this role, and that these traits must be unimpeachable. (Id.)

Plaintiff further claims that she has already faced questions in this role about her

actions, character, and judgment in relation to the podcast. (Id.)  An unidentified

entity has allegedly warned her that the podcast may result in her not being hired to

testify in some or all cases, which would cost her employment and deprive "Courts

of her expert perspective on trauma." (Id.)  She asserts that as a result, Defendants

have "irrevocably damaged her reputation," while they have profited from her interview.  (Id.)

Plaintiff asserts two causes of action against Defendants: defamation and fraudulent inducement.  (Id. at 7–8.)  Her defamation action is premised on the fact that Defendants "communicated false and defamatory statements about Plaintiff to third persons with malice," which resulted in Plaintiff suffering injury. (Id. at 7.)  Plaintiff claims that she is a private individual who is not in the public eye for any purpose and that the defamatory statement concerned a matter of private concern.  (Id.)  Her fraudulent inducement action is premised on the fact that several weeks after her interview with Cavanagh, the podcast contacted her and asked her to sign a "Talent Appearance Release" document with an entity identified as Tradecraft Alternative.  (Id. at 8.)  Plaintiff alleges that she only signed the Release because of fraud, making it unenforceable.  (Id.)  She asserts that Jordan Harrelson's involvement and Brett Harrelson's role as executive producer was material information that was purposely withheld from Plaintiff. (Id.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In analyzing whether to grant a 12(b)(6) motion, a court accepts as true "all well pleaded facts" and views those facts "in the light most favorable to the plaintiff."  United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (citation omitted).  A court need not "accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678.  In considering a Rule 12(b)(6) motion, a "court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498–99 (5th Cir. 2000)).

## DISCUSSION

In their Motion to Dismiss, Defendants argue that Plaintiff's claims for defamation and fraudulent inducement must be dismissed because she has failed to state a claim under Rule 12(b)(6) and the Texas Citizens Participation Act. (Dkt. # 12 at 9.)

I. Rule 12(b)(6)

As a preliminary matter, Defendants attached many exhibits to its Motion to Dismiss and Plaintiff attached several exhibits to her Response. In considering a 12(b)(6) motion, the Court can properly consider the transcripts of the podcast attached to Defendants' Motion because the allegedly defamatory statements were made in the podcast. See Robinson v. Radio One, Inc., 695 F. Supp. 2d 425, 428–29 (N.D. Tex. 2010) (allowing a clip of the broadcast attached to the motion to dismiss of the alleged defamatory statement to be considered); Busch v. Viacom Intern., Inc., 477 F.Supp.2d 764, 776, n.6 (N.D. Tex. 2007) (same). Plaintiff's Complaint referred to the podcast throughout and the podcast is central to Plaintiff's claims, so the podcast and its transcripts can be considered for the 12(b)(6) Motion.

Additionally, Defendants submitted the Talent Appearance Release ("Release") as an attachment to their Motion (Dkt. # 12-7 at 2–3) and references language in the Release therein (Dkt. # 12 at 34). Because Plaintiff's claim for fraudulent inducement is based almost entirely on the Release and the fact that Plaintiff signed it, the Court can properly consider it in deciding a Motion to Dismiss. See In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007). However, the Court will not consider the attached news articles, affidavits,

biographies, or any other attachments to Defendants' Motion to Dismiss or Plaintiff's Response.

A.   <u>Defamation</u>

Plaintiff asserts a defamation claim against Defendants based on Defendants' alleged communications of false and defamatory statements about Plaintiff to third parties with malice.  (Dkt. # 1 at 7.)  To maintain a defamation claim, the plaintiff must plead facts that show the defendant: (1) published "a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases."  <u>See</u> <u>In re Lipsky</u>, 460 S.W.3d 579, 593 (Tex. 2015) (citing <u>WFAA–TV, Inc. v. McLemore</u>, 978 S.W.2d 568, 571 (Tex. 1998)).  Defendants first argue that the defamation claim against Tradecraft Alternative, LLC should be dismissed.  (Dkt. # 12.) Plaintiff failed to mention or attribute any conduct related to the alleged defamation to Defendant Tradecraft Alternative, LLC in her complaint.  (Dkt. # 1.) Because Plaintiff has not stated any factual or legal basis to demonstrate Tradecraft's involvement in the podcast or in any of the complained of conduct, the defamation claim against Tradecraft is dismissed without prejudice.

A statement is considered defamatory under Texas law "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity,

virtue, or reputation." Id. (citing McLemore, 978 S.W.2d at 571).  For a defamation claim in Texas, "whether the words used 'are reasonably capable of a defamatory meaning'" is the threshold question.  Dallas Morning News, Inc. v. Tatum, 554 S.W.3d 614, 624 (Tex. 2018) (quoting Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 655 (Tex. 1987)).  Determining whether statements are capable of a defamatory meaning is an objective, not subjective inquiry.  Id. (citing New Times, Inc. v. Isaacks, 146 S.W.3d 144, 157 (Tex. 2004)).  If a statement is ambiguous, and thus it is not objectively reasonably capable of a defamatory meaning, then it is the responsibility of the jury to determine what the statement means.  Id. (citing Musser, 723 S.W.2d at 655).  Additionally, "[i]t is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."  Lipsky, 460 S.W.3d at 594 (quoting Bentley v. Bunton, 94 S.W.3d 561, 579 (Tex. 2002)).

There are several types of statements that are not capable of a defamatory meaning.  Id.  "The truth of a statement is an absolute defense to a claim for defamation."  Klentzman v. Brady, 312 S.W.3d 886, 898 (Tex. App.— Houston [1st Dist.] 2009) (Klentzman I) (citing Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766 (Tex. 1987).  And a true accounting is not actionable regardless of what someone may infer unless it creates a false and defamatory

11

impression by omitting or juxtaposing facts in a misleading way.  Id.  Additionally,

"'statements that are not verifiable as false' are not defamatory."  Dallas Morning

News, Inc. v. Tatum, 554 S.W.3d 614, 638 (Tex. 2018) (citing Neely v. Wilson, 418

S.W.3d 52, 62 (Tex. 2013)).  And "even when a statement is verifiable, it cannot

give rise to liability if 'the entire context in which it was made' discloses that it was

not intended to assert a fact."  Id. (citing Bentley, 94 S.W.3d at 581).  "A statement

that fails either test—verifiability or context—is called an opinion."  Id.

The reasonable meaning of allegedly defamatory statements is a

question of law, involving two independent steps.  Tatum, 554 S.W.3d at 625.

"The first is to determine whether the meaning the plaintiff alleges is reasonably

capable of arising from the text of which the plaintiff complains," and "[t]he

second step is to answer whether the meaning—if it is reasonably capable of

arising from the text—is reasonably capable of defaming the plaintiff."  Id.  (citing

D Mag. Partners, L.P. v. Rosenthal, 529 S.W.3d 429, 437–41 (Tex. 2017)).

"Textual defamation occurs when a statement's defamatory meaning

arises from the words of the statement itself," meaning the "statement's literal text

and its communicative content align—what the statement says and what the

statement communicates are the same."  Tatum, 554 S.W.3d at 626–27.

Defamation by implication, on the other hand, is a subset of textual defamation that

occurs "[w]hen a publication's text implicitly communicates a defamatory

statement." Id. at 27.  The meaning of textual defamation arises in one of three ways: (1) explicitly, (2) "implicitly as a result of the article's entire gist," or (3) "implicitly from a distinct portion of the article rather than from the article's as-a-whole gist." Id.  Construction of meaning is likewise required for claims of defamation by implication. Id. at 629.  While the same general question of whether the publication is reasonably capable of being defamatory applies, "the judge's task is to determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." Id. at 629–31.

      "A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true." Neely v. Wilson, 418 S.W.3d 52, 63–64 (Tex. 2013)).  "[T]he substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details." Turner, 38 S.W.3d at 115.  Under the substantial truth doctrine, "minor inaccuracies do not amount to falsity so long as 'the substance, the gist, [and] the sting'" of the claim is justified. Masson, 501 U.S. at 517.  A statement is not actionable based on the substantial truth doctrine if "in the mind of the average person who reads the statement, the allegedly defamatory statement is not more damaging to the plaintiff's reputation than a truthful statement would have been." Id. at 899 (citing McIlvain, 794 S.W.2d at 16).

Plaintiff complains that Cavanagh stated that the FBI "found" Plaintiff after an extensive search for witnesses when that was not true, and Cavanagh knew it was not true, because Plaintiff presented herself to the FBI as soon as she learned of the judge's murder ("found statement").  (Dkt. # 1 at ¶ 16.)  Plaintiff also claims the podcast misrepresented her as being complicit with the FBI in manufacturing evidence against Charles Harrelson because Cavanagh suggested that the FBI was desperate for evidence and witnesses and then shortly thereafter stated that the FBI found Plaintiff ("complicit implication").  (Dkt. # 16 at 13) (citing Dkt. # 1 at ¶ 16).

Plaintiff also states that the podcast referring to Plaintiff as a "very unusual witness" because of the FBI's use of hypnosis therapy to conduct her interviews was defamatory ("unusual witness statement").  (Id.) (citing Dkt. # 1 at ¶ 15).  Relatedly, Plaintiff complains that Cavanagh falsely portrayed her as an unusual witness by emphasizing the fact that the hypnosis tapes were played for the jury and questioning whether that type of testimony is admissible or reliable and by not mentioning that it was the Harrelson defense team who played the hypnosis tapes for the jury ("hypnosis statements").  (Id.) (citing Dkt. # 1 at ¶ 15). Additionally, Plaintiff complains that Cavanagh portrayed her as a "star witness," which she claims is false and defamatory ("star witness statement").  (Dkt. # 1 at ¶ 15).  Plaintiff further claims that the podcast portrayed her as an unreliable

witness because Cavanagh speculated throughout the podcast that various trial witnesses, including Plaintiff, lied at trial, or had hidden motives to provide testimony ("unreliable eyewitness implication").  (Id. at 13) (citing Dkt. # 1 at ¶ 13).[1]

In support of their Motion to Dismiss, Defendants argue that Plaintiff has not pled actionable defamatory statements.  (Dkt. # 12 at 18–19.)  They assert that all the statements and implications named in the Complaint are either substantially true, not capable of defamatory meaning, or nonactionable opinions.  (Id. at 20.)  Plaintiff argues that she has pled facts to show that the podcast defamed her by giving listeners a "false impression regarding her reliability and truthfulness."  (Dkt. # 16 at 14.)  Defendants also argue that Plaintiff failed to plead the appropriate standard of fault, and therefore dismissal is appropriate.  (Dkt. # 12 at 9.)  Defendants further argue that Plaintiff's defamation claim warrants dismissal under the Defamation Mitigation Act ("DMA") because she has not made a sufficient request for a correction, clarification, or retraction.  (Dkt. # 16 at 18.)

---

[1] In Plaintiff's Response, she lists another allegation from the complaint that does not appear to have any bearing on the defamation claim: Jason Cavanagh worked closely with Jordan and Brett Harrelson on the podcast and Plaintiff would not have agreed to provide an interview if Cavanagh had disclosed their involvement to her. (Dkt. # 16 at 13) (citing Dkt. # 1 at ¶¶ 11, 14).

Additionally, Defendants argue that the podcast is protected by both the fair report and fair comment privilege.  (Dkt. # 12 at 27–28.)  In response, Plaintiff asserts that Defendants abused the privilege by making the defamatory statements knowing they were false or not acting for the purpose of protecting the interest for which the privilege exists, so the privilege should not serve as grounds for dismissal under 12(b)(6).  (Dkt. # 16 at 14.)  Lastly, Defendants argue that Plaintiff's defamation claim must be dismissed because she did not adequately plead damages.  (Dkt. # 12 at 31–32.)  Plaintiff rebuts this argument by claiming her suit is one for defamation per se "because the statements are 'so obviously harmful that general damages [such as loss of reputation] may be presumed.'" (Dkt. # 16 at 9) (quoting Lipsky, 460 S.W.3d at 593).  Defendants' arguments relating to the statements not being defamatory are addressed below.

1. Found Statement and Complicit Implication

Defendants argue that the found statement is substantially true and not capable of a defamatory meaning.  (Dkt. # 12 at 20–21.)  Relatedly, Defendants argue the complicit implication is not an objectively reasonable interpretation of the podcast.  (Id. at 25.)  Near the beginning of the sixth episode, Cavanagh describes the FBI as "spend[ing] a lot of time out here looking for witnesses" and "[j]ust stopping every car that came by during an hour before and an hour after for several weeks."  (Dkt. # 12-3 at 8.)  Next, Cavanagh says that the "FBI did *find* an

16

eyewitness named Chrys Lambros who claimed she'd bumped into a strange man at the bottom of a stairwell, about an hour before the Judge was shot."  (Id.) (emphasis added).

Plaintiff later answers a question posed by Cavanagh about when she encountered Charles Harrelson at her apartment complex.  (Dkt. # 12-3 at 8.)  In this recounting of her experience, after describing the encounter and later learning at the courthouse that Judge Wood had been assassinated, she stated: "I headed for the phone and instantly called the FBI.  And then they immediately asked me to come in."  (Id. at 9.)  This statement also appears to be part of the basis for Plaintiff's claim that the podcast "purposely leads the audience to the false conclusion that Dr. Parker, as a young attorney and officer of the Court, was either complicit or actively participated in manufacturing evidence to perpetuate an unfair trial on Charles Harrelson."  (Dkt. # 1 at ¶ 16.)  A little later in the episode, while talking about her hypnosis testimony to the FBI, the podcast plays a portion of Plaintiff's interview that included her saying the following: "But let's not forget that at the time the agenda was so great, this man had to be convicted.  If he were not convicted, then the entire justice system would have proven itself impotent in the face of threats like that."[2]  (Dkt. # 12-3 at 9.)

---

[2] This statement that was made by Plaintiff and played during the podcast perhaps comes the closest to suggesting what is alleged by Plaintiff, but even this statement does not convey a reasonable implication that Plaintiff was complicit with the FBI

The Court will first consider the reasonable meaning of the found statement.  The definition of find includes: "to discover (something or someone) without planning or trying to"; "to discover (something or someone) by chance"; "to get or discover (something or someone that you are looking for)"; and "to discover or learn (something) by studying about it."  *Find*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/find.  Based on these definitions of find enveloping a situation where a party discovers something it was not looking for, the podcast referring to the FBI finding Plaintiff does not contradict the fact that Plaintiff contacted the FBI on the same day of the shooting.  As a result, the found statement is substantially true and is not capable of a defamatory meaning.

Next, the Court will consider whether Plaintiff being complicit with the FBI or helping the FBI to manufacture evidence to convict Charles Harrelson is among the implications that an objectively reasonable reader would draw from the podcast.  Even if the original presentation of the FBI finding Plaintiff as a witness could have led a reasonable person to believe that the FBI located Plaintiff as a result of a desperate search for evidence and witnesses, the fact that shortly thereafter Plaintiff explains that she first contacted the FBI about what she had seen as soon as she learned of the murder would prevent a reasonable person from

---

or helped the FBI manufacture evidence.  At most, it suggests that Plaintiff thought it was important that Charles Harrelson was convicted, which is not defamatory.

concluding that Plaintiff was complicit with the FBI in any way. The complicit implication is not a reasonable interpretation of the statements made on the podcast and is not capable of a defamatory meaning.

      2. <u>Star Witness, Unusual Witness, and Hypnosis Statements</u>

      Defendants argue that the star witness statement is substantially true, which they allege is clear based on Plaintiff's own statements in the podcast, and that being a star witness is a descriptive term that does not injure Plaintiff's reputation or expose her to public hatred, contempt, or ridicule. (Dkt. # 12 at 21.) In the podcast, Plaintiff is described as the "star witness" in the context of discussing whether she was reliable because she was wrong about who directed a previous documentary Plaintiff appeared in. (Dkt. # 12-3 at 15.) The episode description also states that "something isn't adding up with their star witness." (<u>Id.</u> at 5.) Near the beginning of the sixth episode, the podcast plays a portion of Plaintiff's interview in which Cavanagh asks Plaintiff to tell him what her role was in the "whole thing." (Dkt. 12-3 at 8.) Plaintiff says: "I wound up being a principal witness in the case because I was the only person to have actually identified the suspect who was, of course, Charles Harrelson." (<u>Id.</u>) Plaintiff later states that "over time I became aware that I was the only witness whose particular location pinpointed the exact point in time when he was where he was" and that it

19

"took a long time to sink in, that one small second of time played such a significant role in identifying him as the hitman."  (Id. at 14.)

On its own, describing Plaintiff as the star witness would not be defamatory to Plaintiff as is required for a defamation claim because it is substantially true: She refers to herself as being the principal witness, the only witness who was able to place Charles Harrelson at the scene of the murder, and a witness that played a significant role.  The reasonable meaning of the star witness statement is that the witness played an important and perhaps substantial role in determining the outcome of the trial.  Therefore, being a star witness in a case, especially a case that resulted in the conviction of the defendant, would not injure Plaintiff's reputation or expose her to public hatred, contempt, or ridicule in the eyes of a reasonable person.

Defendants also argue that the unusual witness statement is substantially true, a protected opinion, and nondefamatory.  (Dkt. # 12 at 22–23.) Plaintiff's accusation of the podcast casting her as an unusual witness is based on the following.  Right before the podcast in its sixth episode starts playing portions of Plaintiff's interview, Cavanagh is finishing up a discussion with Ray Jahn, who prosecuted Charles Harrelson for the murder of Judge Wood.  (Dkt. # 12-3 at 8.) Ray Jahn stated that Plaintiff was a "[v]ery unusual and very, very effective witness."  (Id.)  Additionally, the sixth episode of the podcast was ultimately

20

named "A Very Unusual Witness."  (Dkt. # 12-3 at 5.)  These are the only

statements in the podcast referring to Plaintiff as an unusual witness.  (See id.)

   The characterization of Plaintiff as being an unusual witness is largely

presented to the audience in conjunction with the FBI's use of hypnosis therapy to

jog Plaintiff's memory.  Plaintiff describes her initial interview with the FBI as

working "with them quite extensively in creating a picture of Harrelson" and that

"it didn't quite come together," so the next step for her was "to start working with

the hypnotist."  (Dkt. # 12-3 at 9.)  Before playing audio from one of the actual

hypnosis clips of Plaintiff, Cavanagh narrates: "In a display of questionable

judgment, the FBI had Chrys Lambros hypnotized."  (Id.)  Cavanagh then plays a

portion of Plaintiff's interview with him in which he asks if there was any

controversy at the time over the FBI's use of hypnosis.  (Id.)  Plaintiff answers that

to her knowledge, there was controversy and that she did not know of any similar

uses of hypnosis before or after it was used on her.  (Id.)  Cavanagh replies that he

had heard criticism of it and that it would not be admissible today, and Plaintiff

replied probably not, laughed, and that she was sure "the admissibility was

stretched to its absolute limits."  (Id.)

   First, the Court must determine what the reasonable meaning of an

unusual witness is in the context of the podcast and more specifically, the hypnosis

discussion.  Unusual is defined as "not usual" and "uncommon, rare." *Unusual*,

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/unusual.  On its own, the podcast referring to Plaintiff as an unusual witness would not impeach Plaintiff's honesty, integrity, virtue, or reputation.  Further, it is impossible to verify whether Plaintiff was in fact an unusual witness.  Therefore, the unusual witness statement on its own is a nonactionable opinion.

Next, the Court must consider whether the hypnosis statements are reasonably capable of a defamatory meaning.  To do this, the Court must analyze the meaning of the text itself as well as any implications that an objectively reasonable reader would draw from the statements.  The FBI did use hypnosis therapy on Plaintiff in the Charles Harrelson investigation.  It is true—and Plaintiff admits—that the FBI had her work with a hypnotist for the purpose of jogging her memory of the man she ran into at her apartment complex on the morning of Judge Woods's murder.  The statements given by Cavanagh and Plaintiff are opinions that neither believes the hypnosis testimony was necessarily admissible.  Therefore, the hypnosis statements on their own are either substantially true or nonactionable opinions and thus not capable of a defamatory meaning.  From the podcast's statements about the use of hypnosis, an objectively reasonable person would draw implications that (1) hypnosis was not commonly used and is still not commonly used to aid witnesses in giving testimony, (2) Cavanagh believes that testimony given through hypnosis is not admissible evidence, and (3) Plaintiff agrees with

Cavanagh to the extent that hypnosis testimony is probably not admissible today or would stretch the limits of admissibility.  None of these conclusions are defamatory to Plaintiff.

"Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law, a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." Turner, 38 S.W.3d at 114.  The Court will next examine whether the podcast conveyed a false or defamatory meaning by omitting or juxtaposing facts.  The podcast does play audio of Plaintiff's hypnosis testimony from the trial right after Cavanagh and Plaintiff discussed the rarity of hypnosis testimony and its likely inadmissibility.  Plaintiff also alleges in her complaint that the hypnosis testimony was offered at trial by the defense and not the prosecution, but the podcast failed to ever mention this fact.  (Dkt. # 1 at 6.)  These two factors together appear to make up Plaintiff's assertion that by juxtaposing the discussion of questionable admissibility and then playing the audio of the hypnosis testimony being played at trial, omitting the fact that it was the defense that offered it into testimony, the podcast perpetuated the notion that Charles Harrelson's trial was unfair.  (Id.)

Plaintiff also claims that the podcast's presentation of her hypnosis portrayed her as being "complicit in a scheme to convict Charles Harrelson with fabricated evidence that should have been inadmissible." (Id.) Additionally, Plaintiff draws attention to Cavanagh stating that the use of hypnosis was a "display of questionable judgment." (Id.) The Court does not find that the reasonable ordinary listener of the podcast would draw the conclusion that Plaintiff was part of some conspiracy to admit fabricated evidence. It does not even imply that Plaintiff was part of introducing her hypnosis testimony at all. Further, even if this presentation of the hypnosis discussion could result in an implication that is defamatory, no reasonable person would find it defamatory towards Plaintiff. At most, the presentation of the hypnosis discussion could be interpreted as critical towards the FBI or the trial court that admitted the hypnosis testimony. Therefore, the star witness, unusual witness, and hypnosis statements and related implications are not capable of a defamatory meaning towards Plaintiff.

### 3.  Unreliable Eyewitness Implication

Defendants argue that Cavanagh's opinion on whether Plaintiff was a reliable witness is a nonactionable opinion. (Dkt. # 12 at 23.) They argue that similar to Tatum, Cavanagh's opinion is not actionable because he based his opinion on disclosed facts, which he told to the audience. (Id. at 23–24) (citing Tatum, 554 S.W.3d at 639–40). At the beginning of the sixth episode, the podcast

24

features Plaintiff telling Cavanagh that his podcast is the second documentary she would be featured in and that the first one was "FBI: The Untold Stories," which she states was directed by Christopher Walken.  (Dkt. 12-3 at 8.)  She goes on to say that Walken was exceptionally nice when she met him and commented that a lot of people did not realize he was a director and producer.  (Id.)

Later on in the episode, Cavanagh calls a producer for the podcast named Andrew.  (Id. at 14.)  Cavanagh tells Andrew that Plaintiff told him Walken directed the documentary she was featured in and asks Andrew to look into it because Cavanagh would like to interview him for this podcast if it is true.  (Id.)  Andrew responds that Walken's IMDB page only lists one credit as a Director for "Popcorn Shrimp," and there is no mention of the FBI documentary on the page.  (Id.)  Andrew apparently called Cavanagh back the next day to relay that he got in touch with the creator of "FBI: The Untold Stories," and the creator told him that Walken had not directed the episode on Judge Wood.  (Id.)

Cavanagh asks Andrew if he thought Plaintiff was just confused and Andrew responded that he thought it was possible but that Walken had been a "big deal back then," so "[y]ou would know if you met him."  (Id.)  Cavanagh then states on the podcast that he decided to ask Walken's agent to see if he directed the episode, and Walken's agent replied that "[h]e has never directed."  (Id.)  Cavanagh says that this seems like an unusual mistake for Plaintiff to make and he was not

25

sure how he felt about it.  (Id. at 14–15.)  He finishes the episode by saying that on one hand Charles Harrelson looks guilty as sin, but on the other hand, he couldn't help but ask himself if Chrys Lambros, the star witness in the Judge Wood murder case, was an unreliable witness.  (Id. at 15.)  Additionally, the episode description states that "something isn't adding up with their star witness."  (Id. at 5.)

Lastly, Plaintiff argues that the podcast portrays her as an unreliable witness because Cavanagh speculated throughout the podcast that various trial witnesses, including Plaintiff, lied at trial, or had hidden motives to provide testimony.  (Dkt. # 1 at ¶ 13.)  However, in the ninth episode, while discussing Plaintiff and her testimony, Cavanagh also stated: "It's interesting.  *I believe her*. And I certainly believed her when I was speaking to her.  But she told me a couple things that were questionable, that made me question that."  (Dkt. # 12-3 at 69) (emphasis added).  The podcast guest Alan Brown then responded, "Oh, she's a screwball.  I didn't believe her at all at first, but then once I saw how the lineup worked, *I believe that she did see him*."  (Id.) (emphasis added).

Notably, the complaint acknowledges that Cavanagh was only *speculating* about various trial witnesses throughout the podcast.  A statement that is unverifiable is a nonactionable opinion, and even when a statement is verifiable, if the context makes clear that it is not meant to be a factual statement, it is a nonactionable opinion.  While it is possible that stating someone is an unreliable

26

witness could injure her reputation as a reliable witness or for truthfulness,
expressing an opinion that injures someone's reputation for truthfulness does not
amount to defamation.  Throughout the podcast, when Cavanagh presents the
information that he has collected or learned about the assassination of Judge Wood,
the investigation, trial, and conviction of Charles Harrelson, and Harrelson's
criminal past in general, he does not present it as fact.  Even though he asks
whether Plaintiff was a reliable witness, he later acknowledges that he believes her.
Further, at the end of the series, Cavanagh even states that he has his own ideas,
but "I'll leave it to you to make up your own mind."  (Dkt. # 12-3 at 119.)  This
clearly indicates that he did not intend for the audience to accept his
characterizations as fact.  Therefore, the unreliable witness statements are not
capable of a defamatory meaning and the alleged implications are not among the
conclusions a reasonable listener would draw.

### 4. Podcast as a Whole

Lastly, the Court will consider whether the podcast as a whole
defames Plaintiff as she alleges.  Defendants characterize the gist of the podcast as
"a journalistic exploration of the Wood assassination and the concomitant larger
threats to the American judicial system, Harrelson's criminal activities, and
problems in the criminal justice system more broadly."  (Dkt. # 12 at 8.)  The
podcast analyzes some of the events surrounding the trial and conviction of

27

Charles Harrelson, but it would not lead a reasonable listener to believe that Plaintiff was complicit with the FBI for the same reasons as explained above. Further, any implications that Plaintiff was an unreliable witness were presented as opinions based on disclosed facts that were not presented in a way that juxtaposed or omitted relevant facts in a way that was misleading.

Additionally, the gist of the podcast is the most critical towards the FBI, the prosecutors, and the other decisionmakers at the trial.  Even Plaintiff's complaint states that the podcast ultimately leaves the audience with the impression that "the truth is ultimately unknowable, not that this was a thoroughly litigated criminal proceeding, upheld twice by the Fifth Court of Appeals, and twice examined by the Supreme Court of the United States."  (Dkt. # 1 at 5.)  As a result, the podcast as a whole does not carry the defamatory meanings alleged by Plaintiff and is not defamatory towards her.

Plaintiff has failed to plead facts that would constitute false and defamatory statements as required by Texas law to state a defamation claim or facts that would show the podcast as a whole is reasonably interpreted to be defamatory towards Plaintiff.  Thus, Plaintiff's defamation claim is dismissed without prejudice.  Because the Court dismisses on other grounds, it does not need to reach the remainder of Defendants' arguments for dismissal.

28

B.   Fraudulent Inducement

1.  Pleading Fraudulent Inducement with Sufficient Specificity

Defendants argue that Plaintiff failed to plead two essential elements

of her fraudulent inducement claim under Rule 12(b)(6) and the heightened

particularity required under Federal Rule 9(b).  (Dkt. # 12 at 10.)  As a result, they

argue the fraudulent inducement claim must be dismissed.  (Id.)  Rule 9(b)

"requires a party to plead 'the circumstances constituting fraud . . . with

particularity.'"  U.S. ex rel. Williams v. Bell Helicopter Textron Inc., 417 F.3d 450,

453 (5th Cir. 2005) (citing Fed. R. Civ. P. 9(b)) (alterations in original).  "In cases

concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically

requires the claimant to plead the type of facts omitted, the place in which the

omissions should have appeared, and the way in which the omitted facts made the

representations misleading."  U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355

F.3d 370, 381 (5th Cir. 2004) (quoting 2 JAMES W. MOORE ET AL., MOORE'S

FEDERAL PRACTICE § 9.03[1][b], at 9–18 through 9–19 (3d ed. 2003)).

Plaintiff argues that she did plead a plausible claim for fraudulent

inducement based on factual allegations showing that (1) Plaintiff knew about the

"Harrelson brothers' decades-long crusade" to cast doubt on their father's

conviction (Dkt. # 16 at 15) (citing Dkt. # 1 at ¶¶ 14, 15); (2) Defendants' failure to

disclose Jordan or Brett Harrelson's involvement with the podcast to Plaintiff (id.)

(citing Dkt. # 1 at ¶ 14); and (3) the fact that Plaintiff would not have agreed to the interview for the podcast if she had been aware of the Harrelson brothers' involvement and would not have signed a release (id.) (citing Dkt. # 1 at ¶ 14).

> Texas law provides:
>
> The elements of fraud by nondisclosure are (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge.

Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P., 335 S.W.3d 297, 304 n.6 (Tex. App.—Houston [14th Dist.] 2010) (citing 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc., 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th Dist.] 2007, no pet.)).  "Fraud by omission or non-disclosure is simply a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose."  Id. at 304 (citing Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.)).

There are several factual scenarios that may give rise to the duty to disclose, including (1) a confidential or fiduciary relationship exists among the

parties, (2) one of the parties voluntarily discloses some information, which then

creates a duty to disclose the entire truth, (3) one of the parties makes a

representation that becomes misleading or untrue unless the party discloses new

information, (4) one of the parties makes a partial disclosure, creating a false

impression and the duty to speak.  Solutioneers, 237 S.W.3d at 385 (citing Ins. Co.

of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998) and Four Bros. Boat Works,

Inc. v. Tesoro Petroleum Cos., 217 S.W.3d 653, 670–71 (Tex. App.—Houston

[14th Dist.] 2006, pet. filed)).  Plaintiff does not plead facts that indicate that any

of the four aforementioned factual situations exist, nor does she even make a

conclusory allegation that Defendants owed her any duty to disclose.  (See

Dkt. # 1.)

       Materiality is based on "whether a reasonable person would attach

importance to and would be induced to act on the information in determining his

choice of actions in the transaction in question."  Reservoir, 335 S.W.3d at 305

(citing Am. Med. Int'l v. Giurintano, 821 S.W.2d 331, 338 (Tex. App.—Houston

[14th Dist.] 1991, no writ)).  While Plaintiff does plead facts explaining why she

would have declined to participate in the interview with Cavanagh had she known

of the Harrelson brothers' involvement, she does not plead facts to show that

disclosure of their involvement would induce a reasonable person to not

participate.  (See Dkt. # 1.)  Therefore, Plaintiff has not adequately pled a

fraudulent inducement claim under either Rule 12(b)(6) or the heightened standard under Rule 9(b).

2.  Release Barring Fraudulent Inducement Claim

Defendants also argue that the Release bars Plaintiff's claim for fraudulent inducement and therefore this claim should be dismissed with prejudice. (Dkt. # 12 at 34.)  Plaintiff did not address this argument in her reply.  (See Dkt. # 16.)  "When 'sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement.'"  Int'l Bus. Machines Corp. v. Lufkin Indus., LLC, 573 S.W.3d 224, 229 (Tex. 2019), reh'g denied (May 31, 2019) (quoting Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 332 (Tex. 2011)).

The clause must clearly and unequivocally express a "party's intent to disclaim reliance on the specific misrepresentations at issue" in order to preclude a fraudulent inducement claim.  Id. (citing Forest Oil Corp. v. McAllen, 268 S.W.3d 51, 60–61 (Tex. 2008)).  Courts must consider the following factors in making a determination as to whether the contract bars suit:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
> (2) the complaining party was represented by counsel;
> (3) the parties dealt with each other at arm's length;

32

(4) the parties were knowledgeable in business matters; and

(5) the release language was clear.

Lufkin, 573 S.W.3d at 229 (quoting Italian Cowboy, 341 S.W.3d at 337 n.8).

In the following cases, courts found that the contract language clearly and unequivocally disclaimed reliance: In one case, the contract stated that the Defendant "is not relying upon any representation made by or on behalf of IBM . . . , including, without limitation, the actual or estimated completion date, amount of hours to provide any of the Services, charges to be paid, or the results of any of the Services to be provided under this SOW." Lufkin, 573 S.W.3d at 228.  In a second case, the contract stated that the "customer is not relying on any advice or advertisement of ADT.  Customer agrees that any representations, promise, condition, inducement or warranty, express or implied, not included in writing in this agreement shall not be binding upon any party." Shakeri v. ADT Sec. Servs., Inc., No. 3:13-CV-2852-D, 2014 WL 5780955, at *8 (N.D. Tex. Nov. 6, 2014), aff'd on other grounds, 816 F.3d 283 (5th Cir. 2016).  In a third case, the contract stated that "none of us is relying upon any statement or representation of any agent of the parties being released hereby" and "[e]ach of us is relying on his or her own judgment." Schlumberger Technology Corp. v. Swanson, 959 S.W2d 171, 180 (Tex. 1997).

The Release in the present case states: "I confirm that I am not signing below in reliance on any statement, opinion, or representation by Producer or anyone acting on behalf of Producer." (Dkt. # 12-7 at 2.) Based on other court's interpretation of similar language, this provision provides a clear and unequivocal intent to disclaim reliance. However, viewing the facts in the complaint in the light most favorable to the plaintiff, the terms of the contract appear to be boilerplate, Plaintiff was not represented by counsel, and a law degree does not necessarily make someone knowledgeable in business matters. See Lufkin, 573 S.W.3d at 229. As a result, the Court will dismiss the fraudulent inducement claim without prejudice.

II. Texas Citizens Participation Act ("TCPA")

In the alternative, Defendants argue that Chapter 27 of the Texas Civil Practices and Remedies Code requires dismissal of both the defamation and fraudulent inducement claims because the podcast "addresses issues of public concern including the highly publicized assassination of a federal judge—and it's production and publication thus involve the exercise of Defendants' right of free speech and fall within the purview of the TCPA." (Dkt. # 12 at 10.) In Klocke v. Watson, 936 F.3d 240 (5th Cir. 2019), the Fifth Circuit held that the burden-shifting framework of Chapter 27 of the TCPA "imposes additional requirements beyond those found in Rules 12 and 56 and answers the same question as those rules, the

34

state law cannot apply in federal court." <u>Id.</u> at 245.  In conducting its analysis, the court considered the language of the TCPA, and ultimately asked whether the statute changed "what . . . circumstances under which a court must dismiss a case before trial." <u>Id.</u>

Plaintiff argues that the TCPA is not applicable in federal courts for diversity cases as a result (Dkt. # 16 at 15–21), whereas Defendants assert that the amendments to the statute made shortly after <u>Klocke</u> mean that it no longer prevents the application of the TCPA in this situation (Dkt. # 12 at 37).  Defendants argue that the decision was premised on the TCPA imposing additional requirements demanding a judicial weighing of the evidence.  (<u>Id.</u>)  It is true that the Texas Legislature did amend the chapter and remove the requirement for a showing of a preponderance of the evidence in several instances.  At the time of the <u>Klocke</u> decision, section 27.005(b) provided that "a court shall dismiss a legal action against the moving party if the moving party *shows by a preponderance of the evidence*" and after the amendments, it reads that "a court shall dismiss a legal action against the moving party if the moving party *demonstrates*."  Acts 2019, 86th Leg., ch. 378 (H.B. 2730), § 3, eff. Sept. 1, 2019.  The amendment also changed section 27.005(d) from "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim" to "the court

shall dismiss a legal action against the moving party if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Id.

Based on this Court's reading of the Klocke reasoning, the Texas Legislature did not amend the chapter in a way that cured the issues with the overlap between 12(b)(6) dismissals and TCPA dismissals. As a result, this Court finds that the TCPA is not applicable to federal courts hearing diversity cases. See also Police v. Alexander, No. 4:17-CV-631-ALM-KPJ, 2021 WL 4260494, at *9 (E.D. Tex. Sept. 20, 2021) (holding that the TCPA does not apply in federal courts); Sanchez v. Aldi Texas, LLC, No. 3:21-CV-0165-K, 2021 WL 4441982, at *2 (N.D. Tex. Apr. 28, 2021) (holding that a statute like the TCPA does not apply in federal courts based on Klocke).

## CONCLUSION

For the reasons stated, the Court **GRANTS** Defendants' Motion to Dismiss. (Dkt. # 12.) However, the Court **GRANTS** Plaintiff leave to file an amended complaint, should she choose to do so, within thirty (30) days of the date of this order. Plaintiff is, however, cautioned that in filing an amended complaint Plaintiff must have facts to support any allegations made. Simply changing the words of the complaint without facts to support the change would constitute a violation of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED**.

**DATED**: San Antonio, Texas, November 1, 2021.


_____
David Alan Ezra
Senior United States District Judge